08-1815-cv
ATSI Communications v. The Shaar Fund, Ltd.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: July 6, 2009          Decided: September 2, 2009)

Docket No. 08-1815-cv

- - - - - - - - - - - - - - - - - - - - -x

ATSI COMMUNICATIONS, INC., a Delaware
Corporation,

Plaintiff,

MARYANN PERONTI, GARY M. JEWELL and JAMES
WES CHRISTIAN, CHRISTIAN SMITH & JEWELL,
LLP, and KOERNER, SILBERBERG & WEINER, LLP,

Appellants,

  - v.-                                    08-1815-cv

THE SHAAR FUND, LTD., LEVINSON CAPITAL
MANAGEMENT, SHAAR ADVISORY SERVICES, N.V.,
MARSHALL CAPITAL SERVICES, LLC, JESUP &
LAMONT STRUCTURED FINANCE GROUP, RGC
INTERNATIONAL INVESTORS, LDC, ROSE GLEN
CAPITAL MANAGEMENT L.P., MG SECURITY GROUP,
INC., CORPORATE CAPITAL MANAGEMENT, CROWN
CAPITAL MANAGEMENT, INTERCARIBBEAN SERVICES,
LTD., JOHN DOES 1-50, KENNETH E. GARDINER,
CITCO FUNDS SVCS., IUC HOLLMAN, W.J.
LANGVELD, SAM LEVINSON, HUGO VAN NEUTEGEM,
DECLAN QUILLIGAN, NATHAN LIHON, WAYNE BLOCH,
GARY KAMINSKY, STEVE KATZNELSON and SEI
INVESTMENT CO.,

Defendants,

KNIGHT CAPITAL MARKETS, LLC,

                    Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - -x


          Before:          JACOBS, Chief Judge, CALABRESI and
                           POOLER, Circuit Judges.


    Appeal from an order entered in the United States District Court for the Southern District of New York (Kaplan, J.) imposing sanctions on three attorneys and their law firms pursuant to Fed. R. Civ. P. 11 and the mandatory sanctions provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(c). We agree with the district court that the conduct here was unreasonable, and we reject the argument that In re Pennie & Edmonds LLP, 323 F.3d 86 (2d Cir. 2003) required the district court to find subjective bad faith before imposing sanctions. However, because the concerns identified in Pennie remain relevant to assessing the "reasonableness" of an opposing party's fees under 15 U.S.C. § 78u-4(c)(3), we vacate the amount of the award and remand for further proceedings.

                                   THOMAS I. SHERIDAN, III, Hanly
                                   Conroy Bierstein Sheridan Fisher

& Hayes LLP, New York, NY, <u>for Appellants</u>.

THORN ROSENTHAL, Cahill Gordon & Reindel LLP, New York, NY, <u>for Defendant-Appellee</u>.

DENNIS JACOBS, <u>Chief Judge</u>:

Three lawyers and their two firms appeal from an order imposing sanctions entered in the Southern District of New York (Kaplan, <u>J.</u>).  The lawyers represented plaintiff ATSI Communications, Inc. ("ATSI") in a lawsuit alleging (<u>inter alia</u>) that Knight Capital Markets, LLC ("Knight"), the principal market-maker in ATSI stock on the American Stock Exchange ("AMEX") (along with a collection of hedge funds and individual defendants) participated in market manipulation in violation of federal securities laws.  The district court dismissed the case as against all defendants, and we affirmed.  493 F.3d 87 (2d Cir. 2007).  Thereafter, the district court imposed sanctions on certain lawyers and law firms representing ATSI (collectively the "ATSI attorneys") pursuant to the mandatory sanctions provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(c), on the ground that ATSI had no factual basis for bringing suit against Knight.

3

Sanctions were the full amount of Knight's fees and costs in defending the action, $69,656.69.[1]

The chief question presented on appeal is whether the rule established in In re Pennie & Edmonds LLP, 323 F.3d 86 (2d Cir. 2003)("Pennie") required the district court to make a finding of subjective bad faith before imposing sanctions. The ATSI attorneys argue that here, as in Pennie, such a finding is needed because the sanctions procedure (initiated by the district court after the litigation was over) afforded them no 21-day safe harbor in which to withdraw or

---

[1] Subsequent to the filing of the instant appeal, ATSI's attorneys and Knight entered into a settlement agreement, the execution of which was made contingent upon vacatur of the district court's judgment, and of two related orders issued by the district court. The parties jointly moved in this Court for an order vacating the judgment and the orders. See ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd., 547 F.3d 109, 111 (2d Cir. 2008). We denied the motion, explaining that "[d]enial of vacatur here, despite the possibility that the parties' settlement efforts may fail as a result, nonetheless advances 'the public interest' in preserving judicial precedent . . . and the proper course of appellate procedure." Id. at 113 (quoting U.S. Bancorp Mortgage Co. v. Bonner Mall P'Ship, 513 U.S. 18, 26–27 (1994)). We acknowledged that the decisions of a federal district court "are not precedential in the technical sense," id. at 112, but added that "we would be hard pressed to conclude that the judgment here, sanctioning lawyers appearing before a United States District Court, is insignificant. And it is precisely to avoid the public's scrutiny of the sanctions that ATSI's counsel seeks vacatur." Id. at 114.

4

amend the challenged pleading. We conclude that Pennie's subjective bad faith requirement does not exist in the context of the PSLRA because the statute itself puts litigants on notice that the court must (and therefore will) make Rule 11 findings at the conclusion of private litigations arising under the federal securities laws. Such notice alleviates the concern that animates Pennie: that Rule 11 sanctions should not be sprung on lawyers when they no longer have the chance to withdraw or amend a challenged claim. At the same time, however, that concern should inform consideration as to whether opposing attorney's fees are "reasonable" under 15 U.S.C. § 78u-4(c)(3).

## BACKGROUND

More detailed factual background is provided in our previous opinion in this case, ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)("ATSI I").

ATSI describes itself as a firm which was "founded in December of 1993 to capitalize on the opportunities anticipated by trends towards deregulation and privatization of telecommunications markets within Mexico and other Latin

5

American countries." In 1999, needing capital,[2] ATSI issued four series of convertible preferred stock ("Preferred Stock"), shares of which were convertible, with minimal restrictions, to ATSI common shares in increasing amounts as the price of ATSI common shares declined. Because there was no limit on the number of common shares into which the Preferred Stock could convert, securities such as these are called "floorless" convertibles. ATSI I, 493 F.3d at 94. A holder of such Preferred Stock who wanted to increase ownership or acquire the company could actually benefit from a decline in ATSI share price. Accordingly, ATSI elicited the purchasers' representations that they would not sell shares short, or were not purchasing with an intent to resell. Id. at 95-96. ATSI issued Preferred Stock at various points to (among others) defendants The Shaar Fund, Ltd. ("Shaar Fund") and Rose Glen Capital Management, L.P. ("Rose Glen").

Between July 1999 and 2002, ATSI share prices gyrated between $1 and $9 per share, but closed on August 16, 2002

---

[2] ATSI feared that it would not be able to "raise money on any acceptable terms." ATSI I, 493 F.3d at 94 (quoting ATSI Annual Report (Form 10-K) at 16 (July 31, 2000)).

6

at $0.09.  ATSI alleged that these price fluctuations were the result of manipulation by some purchasers of the Preferred Stock, including Shaar Fund and Rose Glen.  On the basis of the trading volume and price movements around the time that the Shaar Fund and Rose Glen converted their shares of Preferred Stock, ATSI believed that these defendants and others engaged in a scheme to cause a "death spiral" in ATSI's share price.  It is alleged that the scheme worked as follows:

> The [defendant] would short sell the
> victim's common stock to drive down its
> price.  He then converts his convertible
> securities into common stock and uses
> that common stock to cover his short
> position.  The convertible securities
> allow a manipulator to increase his
> profits by allowing him to cover with
> discounted common shares not obtained on
> the open market, to rely on the
> convertible securities as a hedge against
> the risk of loss, and to dilute existing
> common shares, resulting in a further
> decline in stock price.

Id. at 96 (footnote omitted).

ATSI sued a host of defendants in October 2002, alleging misrepresentations in connection with securities transactions, and market manipulation in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  However,

7

ATSI's complaint alleged no specific acts of short selling, and instead relied on circumstantial allegations: past similar practice by Shaar Fund and Rose Glen, and clearinghouse records showing that in a 10-trading-day period (December 31, 2002 to January 14, 2003), over eight million shares were traded in excess of settlement, which (ATSI claimed) could only have resulted from "sham" trading. ATSI I, 493 F.3d at 97.

In a First Amended Complaint filed in March 2003, ATSI added a claim of market manipulation against Knight Capital Markets LLC, f/k/a Trimark Securities Inc., (hereinafter "Knight"), the principal AMEX market-maker for ATSI stock.[3] ATSI failed to serve Knight. Judge Kaplan dismissed the complaint without prejudice as against Shaar Fund and Rose Glen on the ground that its allegations of manipulation were "conclusory," "offer[ed] no particulars," and failed to meet the requirements of Rule 9(b). ATSI Commc'ns, Inc. v. Shaar

---

[3] SEC regulations define a "market-maker" as "a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers." 17 C.F.R. § 240.15c3-1(c)(8).

8

Fund, Ltd., No. 02 Civ. 8726(LAK), 2004 WL 616123, at *3 (S.D.N.Y. Mar. 30, 2004).[4]

ATSI then filed a Second and Third Amended Complaint. The Third Amended Complaint's sole allegations concerning Knight were as follows:

> 220. Trimark Securities, a/k/a Knight Securities Group, Inc. ("Knight") was the principal declared market maker in ATSI stock. Most ATSI trades (including, upon information and belief, the 8,257,493 shares that [were traded in excess of settlement]) were traded through Knight.
>
> 221. Any manipulation which took place would have involved Knight, who knew or should have known that they were prohibited from engaging in the activity complained of in paragraphs 184 through 219 [which purported to allege manipulation by other defendants].
>
> 222. ATSI believes that Knight was a cooperating broker-dealer with the defendants listed herein engaging in similar trades on behalf of the defendants.

Third Amended Complaint ¶¶ 220-22.

All or most of the defendants, including Knight, moved

---

[4] In addition, the district court granted motions by various other defendants to dismiss for lack of personal jurisdiction. ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd., No. 02 Civ. 8726(LAK), 2004 WL 909173 (S.D.N.Y. Apr. 28, 2004).

to dismiss the Third Amended Complaint. In February 2005, the district court granted the motions with prejudice on the ground that the complaint failed to "allege sufficient facts to link this [market] data to any of the defendants." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 357 F.Supp.2d 712, 719 (S.D.N.Y. 2005). The court ruled that the allegations against Knight were "even more tenuous . . . [and] far too conclusory to pas[s] muster under Rule 9(b)." Id. at 719.

At the end, that order referenced the mandatory sanctions provision of the PSLRA, and "invited" the parties to make submissions as to sanctions. Id. at 721. The court explained that the PSLRA requires a district court, at the conclusion of private actions brought under federal securities laws, to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b)." 15 U.S.C. § 78u-4(c)(1). If a violation is found, sanctions are mandatory. Id. at § 78u-4(c)(2).

Multiple defendants--including Knight--moved for Rule 11 sanctions. In opposition, ATSI submitted affidavits from its counsel, James Wes Christian of Christian Smith & Jewell, LLP (a Houston, Texas firm), and its local counsel,

10

Carl S. Koerner, of Koerner, Silberberg & Weiner, LLP, detailing the steps they took prior to bringing suit, and arguing that they had no subjective bad faith. By order dated July 28, 2005, the district court denied the sanctions motions without prejudice to reinstatement pending the appeal of the underlying dismissal.

By opinion dated July 11, 2007, we affirmed the district court's dismissal. ATSI I, 493 F.3d at 104 ("[B]ecause ATSI has not adequately pled that the defendants engaged in any short sales or other potentially manipulative activity, there is no circumstantial evidence of manipulative intent."). As to Knight, we wrote:

> The complaint is plainly insufficient in alleging that [Knight] engaged in market manipulation. It only alleges that [Knight] was the principal market maker in ATSI's stock, that [Knight] knew or should have known of the manipulation, and that ATSI "believes" that [Knight] was a cooperating broker-dealer. Wholly absent are particular facts giving rise to a strong inference that [Knight] acted with scienter in manipulating the market in ATSI's common stock and any allegations of specific acts by [Knight] to manipulate the market, much less how those actions might have affected the market.

Id. at 104-05 (footnote omitted).

After our mandate issued, ATSI entered into settlements

11

with all defendants except Knight, and Knight's motion for sanctions was reinstated. By order dated March 27, 2008, the district court imposed sanctions on the ground that the ATSI attorneys "lacked any reasonable factual basis" for bringing suit against Knight:

> The third amended complaint makes abundantly clear that plaintiff's counsel lacked any reasonable factual basis for asserting that Knight had violated the federal securities laws . . . . The only basis for the claim against Knight was that Knight was the principal market maker, that it therefore must have known that the [other] defendants were engaged in manipulation, and that it therefore must have been complicit. But that is simply ridiculous. Even assuming that Knight was the principal market maker, all that it "must have known" is that some person or persons were engaged in large sales of ATSI common [stock].

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., No. 02 Civ. 8726 (LAK), 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008) (emphasis added). The district court went on to reject as "vague" the ATSI attorneys' arguments that they had diligently researched the claims and had consulted with financial experts before bringing suit. Id. Crucially, the district court did not make a specific finding of bad faith. Sanctions in the amount of $69,656.69, representing Knight's

12

total fees and costs,[5] were imposed jointly and severally against each of the three lawyers whose names appeared on the Third Amended Complaint, and their two law firms: Maryann Peronti, Gary M. Jewell, and James Wes Christian, and the firms of Christian Smith & Jewell, LLP and Koerner, Silberberg & Weiner, LLP.[6]  The ATSI attorneys have timely appealed.

## DISCUSSION

A district court's imposition of sanctions under the PSLRA and Rule 11 is reviewed for abuse of discretion. Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc., 186 F.3d 157, 167 (2d Cir. 1999); cf. Sims v. Blot,

---

[5]  Knight did not seek recovery of an additional $100,000 it claimed to have incurred in connection with ATSI's appeal.  See Appellee's Br. at 8 n.4.

[6]  The day after issuing its sanctions order on March 28, 2008, the district court issued a further order explaining why it had sanctioned James Wes Christian (of Christian Smith & Jewell, LLP) notwithstanding that Knight had not sought sanctions against him.  The court explained that Christian was on ample notice (in light of the other defendants' motions for sanctions against him); and that, under the PSLRA's mandatory sanction provision, the court is not bound by the defendant's notice of motion, but rather must make specific findings as to "each party and each attorney representing any party."  See 15 U.S.C. § 78u-4(c)(1).

13

534 F.3d 117, 132 (2d Cir. 2008) ("A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." (internal citations, alterations, and quotation marks omitted)). We must bear in mind, however, that when the district court is "accuser, fact finder and sentencing judge" all in one, Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 334 (2d Cir. 1999), our review is "more exacting than under the ordinary abuse-of-discretion standard," Perez v. Danbury Hosp., 347 F.3d 419, 423 (2d Cir. 2003).

**I**

Rule 11(b)(3) provides in pertinent part that, by presenting a complaint to the court, the attorney signing or filing the complaint "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3).

14

Since the inquiry must be "reasonable under the circumstances," liability for Rule 11 violations "requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers." Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997)(emphasis omitted).

In In re Pennie & Edmonds LLP, 323 F.3d 86, 91 (2d Cir. 2003), we recognized an exception to the standard of objective unreasonableness applicable when a district court initiates Rule 11 sanctions *sua sponte* "long after" the sanctioned lawyer had an opportunity to correct or withdraw the challenged submission. In such cases, a lawyer may be sanctioned only upon a finding of subjective bad faith. Id. The exception is justified in order to strike a proper "balance," and prevent over-deterrence. Id. at 91. We focused on the procedural differences in how sanctions are imposed under Rule 11(c)(2) and (c)(3). When the sanctions process is initiated by a motion from an opposing party (under Rule 11(c)(2)), the challenged lawyer has a 21-day "safe harbor" to withdraw or amend. When sanctions are initiated by a court *sua sponte* (under Rule 11(c)(3)), no such safe harbor is afforded. The Advisory Committee's note

15

to the 1993 amendments to Rule 11 explained: "Since show cause orders will ordinarily be issued only in situations that are akin to a contempt of court, the rule does not provide a 'safe harbor' to a litigant for withdrawing a claim, defense, etc., after a show cause order has been issued on the court's own initiative."  Fed. R. Civ. P. 11 advisory committee's note to 1993 Amendments.  Pennie reasoned that since show cause orders should only issue in situations "akin to" contempt, and contempt sanctions require a finding of bad faith, Schlaifer Nance, 194 F.3d at 338, then court-initiated Rule 11 sanctions should also require a finding of subjective bad faith, at least when sanctions are imposed at the end of a litigation and the sanctioned lawyer has had no opportunity to withdraw or amend.  Pennie, 323 F.3d at 90.  We perceived a risk that, otherwise, lawyers would be inhibited from filing

> submissions that they honestly believe
> have plausible evidentiary support for
> fear that a trial judge, perhaps at the
> conclusion of a contentious trial, will
> erroneously consider their claimed belief
> to be objectively unreasonable.  This
> risk is appropriately minimized, as the
> Advisory Committee contemplated, by
> applying a "bad faith" standard to
> submissions sanctioned without a "safe
> harbor" opportunity to reconsider.

16

Id. at 91. Pennie stopped short, however, of a blanket rule that the subjective bad faith standard applied whenever there was no longer a safe harbor, finding it sufficient in that case that the court *sua sponte* initiated sanctions proceedings "long after" the lawyer had an opportunity to amend or withdraw. 323 F.3d at 91.[7]

Pennie drew a sharp dissent, which argued that all Rule 11 violations should be assessed under the standard of objective reasonableness, and that the majority over-read the intent of the Advisory Committee.[8] And some circuits have declined to follow Pennie. See Young v. City of

---

[7] We wrote: "It is arguable, as [appellant] contends, that a 'bad faith' standard should apply to all court-initiated Rule 11 sanctions because no 'safe harbor' protection is available and because the Advisory Committee contemplated such sanctions for conduct akin to contempt. However, we need not make so broad a ruling in the pending case." 323 F.3d at 91.

[8] Judge Underhill, sitting by designation, argued that Rule 11 liability should be consistently assessed under the objective reasonableness standard because that standard is set forth in Rule 11(b): "The fundamental flaw in the majority's interpretation of Rule 11 is that it seeks to use procedural distinctions drawn in section (c), regarding how sanctions can be imposed with and without a motion, to modify the substantive requirements of section (b), which controls whether a violation of Rule 11 has occurred. Under a plain reading of Rule 11, the procedural distinctions set forth in section (c) have no bearing whatsoever on the state-of-mind requirement of section (b)." 323 F.3d at 94 (Underhill, J., dissenting).

*Providence ex rel.* Napolitano, 404 F.3d 33, 40 (1st Cir. 2005) (declining to follow Pennie and noting that "only [the Second Circuit] has read the present rule to require bad faith"); Kaplan v. DaimlerChrysler, A.G., 331 F.3d 1251, 1256 (11th Cir. 2003) (declining to "resolv[e] the . . . '*mens rea*' issue that split the Pennie panel").[9]

In this case, the ATSI attorneys' principal argument is that, because the sanctions against them were initiated by the court at a time when the ATSI attorneys no longer had an opportunity to amend or withdraw the pleading, Pennie barred imposition of sanctions without a finding of subjective bad faith.

This case is distinguishable from Pennie because the statutory wording of the PSLRA puts private securities litigants on sufficient notice that their actions will be

---

[9] Instead of requiring subjective bad faith, other circuits have urged district courts to use extra care in imposing sanctions after a lawyer has lost the opportunity to amend or withdraw the challenged claim. See, e.g., Hunter v. Earthgrains Co. Bakery, 281 F.3d 144, 151 (4th Cir. 2002) (In the absence of the safe harbor, "a court is obliged to use extra care in imposing sanctions."); United Nat'l Ins. Co. v. R & D Latex Corp., 242 F.3d 1102, 1115 (9th Cir. 2001) (Rule 11(b)(2) standard "is applied with particular stringency where, as here, the sanctions are imposed on the court's own motion."); Barber v. Miller, 146 F.3d 707, 711 (9th Cir. 1998). None of the other circuits has required a heightened *mens rea*.

the subject of Rule 11 findings. The statute *requires* district courts, at the conclusion of private actions arising under federal securities laws, to make Rule 11 findings as to each party and each attorney, 15 U.S.C. § 78u-4(c)(1); and if a Rule 11 violation is found, the statute *requires* courts to impose sanctions, 15 U.S.C. § 78u-4(c)(2). Such statutory notice is the functional equivalent of the forewarning given litigants by the pendency of a Rule 11 finding. The express congressional purpose of the PSLRA provision was to increase the frequency of Rule 11 sanctions in the securities context, and thus tilt the "balance" toward greater deterrence of frivolous securities claims. "Recognizing what it termed 'the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims,' and commenting that the '[e]xisting Rule 11 has not deterred abusive securities litigation,' the 104th Congress included in the [PSLRA] a measure intended to put 'teeth' in Rule 11." Simon DeBartolo, 186 F.3d at 166-67 (quoting H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730). By virtue of this statutory notice, consideration of sanctions

19

in the PSLRA context can never be *sua sponte* and can never come as a surprise, because Congress, not the court, has prompted and *mandated* a Rule 11 finding.

The PSLRA sanctions provision forecloses the kind of safe harbor afforded in Rule 11(c)(2).  The PSLRA explicitly directs courts to make Rule 11 findings "upon final adjudication of the action," 15 U.S.C. § 78u-4(c)(1), and it is well-settled that no safe harbor could apply retroactively.  See Pennie, 323 F.3d at 89.  "The PSLRA . . . does not in any way purport to alter the *substantive standards for finding a violation of Rule 11*, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found."  Simon DeBartolo, 186 F.3d at 167 (emphasis added).  It is therefore significant that, when the PSLRA was enacted in 1995, Pennie had not yet been decided, and all Rule 11 violations at the time were assessed under the objective reasonableness standard.  See, e.g., Ted Lapidus, 112 F.3d at 96.

In sum, the mandate of the PSLRA obviates the need to find bad faith prior to the imposition of sanctions.  At the

same time, the concerns identified in Pennie have some bearing in the PSLRA context. As will be discussed in Part III, the *ex post* nature of PSLRA sanctions may influence whether an opposing party's fees are *reasonable* under the circumstances; it could not have been Congress's intent to incentivize undue delay, or discourage lawyers from promptly filing their own Rule 11 motions simply because the court will automatically make Rule 11 findings at the end of a litigation.

## II

In the alternative, the ATSI attorneys argue that their actions were reasonable even under an objective standard: "if there was [market] manipulation, it was not unreasonable to impute knowledge of it to Knight." Appellants' Br. at 26. They rely on the role of a market-maker in the securities industry, and argue that market-makers should have "special knowledge" of irregular trading in their assigned securities, especially in thinly traded securities such as ATSI. They also point out that there have been viable claims against market-makers for engaging in manipulation. See In re Blech Sec. Litig., No. 94 Civ. 7696, 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002)).

21

That some market-makers have engaged in manipulation proves nothing. The cases relied upon by the ATSI attorneys are distinguishable in critical respects. In <u>In re Blech</u>, claims against a market maker survived summary judgment because plaintiffs marshaled specific evidence that a market-maker participated in an underwriter's scheme to artificially inflate certain stock prices. 2002 WL 31356498, at *12 ("The Plaintiffs have adduced evidence that whenever [the underwriter] needed to move some stock, [the market-maker] would buy it, hold the stock briefly, and when [the underwriter] found a customer account into which he could place the securities, [the market-maker] would sell the stock back."). Similarly, in <u>Sedona Corp. v. Ladenburg Thalmann & Co.</u>, No. 03 Civ. 3120, 2005 WL 1902780, at *12 (S.D.N.Y. Aug. 9, 2005), a complaint was upheld against several defendants, including market-makers, on the basis of "a great deal of detail regarding the nature of the conduct and techniques allegedly employed in the market manipulation scheme, and numerous details regarding transactions and/or the participation of specific defendants in transactions." <u>Id.</u>

The ATSI attorneys' reliance on the opportunity of a

22

market-maker to manipulate the market reinforces the conclusion that ATSI's complaint against Knight relied on speculation. ATSI has made no sufficient, specific allegation as to why Knight would have been aware of manipulation based on the declines in ATSI share price and assorted other irregularities, let alone who was creating these anomalies, or why. As the District Court explained:

> There would have been no reason [for Knight, as market-maker,] to suppose that the seller or sellers were holders of the convertible preferred, let alone that the object of the sales was to depress the price of the common in order to improve the conversion ratio. And even if that could have been supposed, it is hard to see how a market maker, by executing the transactions, thereby would have become a culpable participant in that scheme.

2008 WL 850473, at *3.

The ATSI attorneys also offer a textual argument--that all of their specific factual allegations (such as that Knight was the principal ATSI market-maker) were true, and their legal claim was phrased conditionally: "Any manipulation which took place would have involved Knight, who knew or should have known that they were prohibited from engaging in the activity complained of in paragraphs 184 through 219." Complaint ¶ 221. According to the ATSI

23

attorneys, the district court imposed sanctions for the inference--drawn by the district court but never alleged in so many words--that Knight knew or should have known of the other defendants' manipulation.  2008 WL 850473, at *3.

We disagree.  The "inference" that Knight knew or should have known of any manipulation is sufficiently drawn from the fact that ATSI *sued* Knight for manipulation.  ATSI could not have sued Knight without alleging overtly or by implication that Knight knew of the manipulation by other defendants, because a claim of market manipulation requires *scienter*.  ATSI I, 493 F.3d at 101-02.[10]  The ATSI attorneys' argument proves too much: if they had not intended to allege that Knight "knew or should have known" of any market manipulation, they would have been vulnerable to Rule 11 sanctions for bringing suit without a sufficient

_____

[10]  The PSLRA heightened the pleading requirements for scienter.  See 15 U.S.C. § 78u-4(b)(2) ("In any private action arising under this chapter . . . the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.") (emphasis added); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007) ("To qualify as 'strong'[,] . . . an inference of scienter must be more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

24

legal basis.

Even assuming it was objectively reasonable for ATSI's attorneys to think that ATSI was the victim of a "death spiral" scheme that violated the federal securities laws, it was not objectively reasonable to sue Knight on no basis other than that Knight had the opportunity to participate in such a scheme.[11]

**III**

The district court imposed monetary sanctions in the amount of $64,656.69, explaining that "[i]t is undisputed that Knight spent $64,656.69 in defending this case, all of it occasioned by plaintiff's frivolous allegations." 2008 WL 850473, at *4. In imposing the full amount of Knight's fees, the district court was following the rebuttable presumption established by the PSLRA that an appropriate sanction for the failure of a complaint to comply with Rule 11 "is an award to the opposing party of the *reasonable*

---

[11] One possibility, not discussed below, is that ATSI sued Knight in order to obtain access to discovery that would have been more difficult to obtain from a third-party. But such a tactic would expose ATSI to Rule 11 liability for presenting a complaint for an improper purpose under Rule 11(b)(1). See, e.g., In re Kunstler, 914 F.2d 505, 518 (4th Cir. 1990) ("If a complaint is not filed to vindicate rights in court, its purpose must be improper.").

25

attorneys' fees and other expenses incurred in the action."

15 U.S.C. § 78u-4(c)(3)(A)(ii) (emphasis added).[12]

Although the concerns identified in <u>Pennie</u> do not require a finding of bad faith, they may bear on the question of the *reasonableness* of Knight's fees.  As we noted in <u>Pennie</u>, one purpose of the 21-day safe harbor is to provide an incentive to opposing attorneys to file Rule 11 motions promptly: delay past the point at which a pleading or motion may be amended or withdrawn may work a forfeiture of Rule 11 remedies.  <u>See</u> <u>Pennie</u>, 323 F.3d at 89  ("Although Rule 11 contains no explicit time limit for serving the motion, the 'safe harbor' provision functions as a practical time limit, and motions have been disallowed as untimely

---

[12]  If a Rule 11 violation is contained in a responsive pleading or dispositive motion, instead of a complaint, the rebuttable presumption is that an appropriate sanction is "an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation."  15 U.S.C. § 78u-4(c)(3)(A)(i).

Under the statute, these presumptions "may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that--(i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or (ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis."  15 U.S.C. § 78u-4(c)(3)(B).

when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission.").

The PSLRA's mandatory sanctions provision can operate to reverse this incentive. By directing a district court to make findings "upon final adjudication of the action," 15 U.S.C. § 78u-4(c)(1), the statute might discourage the filing of prompt Rule 11 motions, allowing lawyers to dither, or even wait on purpose in order to *increase* costs that can be shifted onto sanctioned counsel. Such a delay would waste judicial resources, and impose unfair burdens. Nothing in the PSLRA prevents an adversary from filing a Rule 11 motion at an earlier point in the litigation, before heavy costs have accrued. Even in the context of the PSLRA, a Rule 11 letter from an opposing counsel may bring new facts to light, or prompt a challenged attorney to reconsider.[13] Thus, in determining whether a party's fees are "reasonable" under 15 U.S.C. § 78u-4(c)(3), a district court should consider whether the opposing party's failure to move for Rule 11 sanctions more promptly may have

---

[13] The statutory notice in the PSLRA is an all-purpose reminder, whereas an opposing party may point to a specific aspect of a claim that it believes violates Rule 11.

unnecessarily increased the costs, and thereby unnecessarily increased the sanctions. If so, a "reasonable" award might be only the amount of fees that would likely have been incurred if a Rule 11 motion had been promptly made.

In this case, Knight did not move for Rule 11 sanctions until it was invited to do so by the district court, after the Third Amended Complaint had been dismissed. We have no reason, on this record, to think that Knight's failure to move for Rule 11 sanctions at an earlier stage was the product of undue delay, or a bad faith tactic to shift additional fees and costs onto ATSI.[14] Nevertheless, the district court should have the opportunity to consider in the first instance whether Knight's failure to move for Rule 11 sanctions at an earlier stage had any bearing on whether its fees were "reasonable."[15]

---

[14] Indeed, Knight did not waste much time in filing a motion to dismiss. Knight was served with the Third Amended Complaint on September 29, 2004, and filed its motion to dismiss on November 5, 2004.

[15] The PSLRA's rebuttable presumption that an appropriate sanction is an award of the opposing party's fees (under § 78u-4(c)(3)(A)(i) or (ii)) does not appear to preclude a court from imposing a *greater* sanction, with the remainder going to the court. This way, a district court may impose as great a monetary sanction as it deems necessary (in light of the seriousness of the Rule 11 violation), without impairing the defendant's incentive to

28

## CONCLUSION

For the foregoing reasons, we affirm that part of the district court's order imposing sanctions, but we vacate the amount of the award and remand for further consideration in light of this opinion.

---

act promptly to reduce overall litigation costs.